May it please the Court, Bruce Weirach for Appellant Daniel Westcott. I'd like to reserve five minutes for rebuttal. Mr. Westcott was a commercial Dungeness crab fisherman crewman operating in Glacier Bay National Park. Congress closed Glacier Bay National Park to most commercial fisheries, including the Dungeness crab fishery. That put Mr. Westcott out of a job. Was he a full-time... He was a Dungeness commercial crab fisherman crewman, full-time, operating during the Dungeness crab season. Which is... It's seasonal, it's regulated by the state of Alaska, and it operates in different times of the year depending on the abundancy. So it would be in the summer primarily. Congress, in the late 1990s, closed Glacier Bay and then allocated $23 million to the Park Service to have it come up with a program to fairly compensate those negatively harmed by those commercial fish enclosures. The National Park Service then took it upon itself to develop a program to compensate those negatively harmed by those commercial fish enclosures. And in doing so, it sought substantial public comment and input. It hired a company called Resolve to mediate talks with stakeholders, to set up community meetings, and to talk with interested parties who would be affected by these commercial fish enclosures. Then it prepared a draft compensation plan, and it published notice of that draft compensation plan in the Federal Register. Notice of availability, and it invited public comment. Then the Park Service hired a firm, McDowell Group, to prepare an environmental assessment, excuse me, an economic assessment. And they asked McDowell, tasked McDowell Group, what should we do with this $20 million in order to fairly compensate those harmed by the commercial fish enclosures? And the McDowell Group acknowledged the uncertainties of how to distribute the compensation and who would be harmed by the closures. But essentially, they came up with categories of compensation. Crew members, tanner crab fishermen, ground fish fishermen, communities, processors, processors' employees. Right. As I understand it at that time, they didn't know the identities or the nature of the claims that people within those groups had. Absolutely not. It was a macro view to what to do with this $23 million, and they had to fit everyone under this $23 million. So given that uncertainty, the economic assessment by McDowell was used as the guiding document in the final plan that the Park Service came up with. That economic assessment by McDowell was then subject to further public input and comment. And then finally, at each step of the way, as this plan and program of compensation was being developed, the state received and got written concurrence from the state of Alaska as to how things were progressing. Were there any numbers in that plan at that stage when the state concurred? When the final state concurrence came in September of 2001, there were absolute final numbers in that final plan. And what was the number for the category in which your client would participate? The category, Mr. Gwestcott, was the 90. It was in the record, but it's also set out. And he was to receive. . . No, no, what was in the category, not his share of it? $759,000. And that was later reduced to $33,000, is that correct? That's $39,000. So when the state gave its final concurrence in September of 2001 to the final compensation plan, the Park Service then published notice of that final compensation plan in the Federal Register.  detailed specific processes that people had to follow. What they had to submit, what information they had to submit, because the only thing that Congress specified is that $23 million would be set aside to fairly compensate those harmed by the commercial fishing closures, and those harmed would have to submit an affidavit. The Park Service then took it upon itself in this final compensation plan because the Park Service stated in the final plan Congress did not provide specific criteria for distributing the $23 million. And that's in the record at Excerpt 58. So the Park Service recognized that public involvement would be a key element to structuring a fair compensation program. Now, everyone knew because of the economic assessment, because of the public notice and comment, because the final plan was noticed in the Federal Register, and because the final plan was published, everyone knew what the amount of money was going to be set aside for each specific category of those harmed, including Mr. Westcott. Was there anything that identified Mr. Westcott's share specifically as to him? No, and if you look at the final plan, what the final plan did, it could only take hypothetical claimants, but it took hypothetical claimants and attached a hypothetical income and did a hypothetical calculation and said this is what will be paid to that fisherman. Well, so when he claims that he's entitled to $256,000, that's hypothetical? No, sir. That was based on the money set aside for the Dungeness crew member category. Then each crew member in the Dungeness crab fishery would submit a claim under that category, and the Park Service then would take their income, apply the amount set aside in that category, and crank out the formula that's set forth in the plan and provide a certain amount of income. And why is the Dungeness crab category more than others in this final plan? Because the Dungeness crab fishery was wiped out by Congress. The Tanner crab fishery can continue, the halibut fishery can continue, and the salmon troll fishery can continue. The Dungeness crab fishery is wiped out. There's no more fishery. He's trying to follow the numbers, so he's claiming $256,000, but that's based on a lifetime projection, is it not? That's because his entire income and livelihood is wiped out. In fact, that would be about one-third of the total amount allocated to this category. Correct, in the Dungeness crab member category. And it's a small, small fishery, but they closed it completely. Well, how many people wound up applying? How many for the program? The Park Service would have that number. It was hundreds because it was all the processor employees, all the processors, communities around Glacier Bay, the Tanner crab fishermen, the halibut fishermen, the salmon fishermen. No, no, I was referring to the Dungeness crab. It was a limited number because it's a limited fishery. Well, it had to be if he would be entitled to one-third of the entire amount, which did follow through, did it not? Then roughly he was eventually allowed $15,000 out of $39,000. That's correct. So essentially, though, this was the economic assessment on which the final plan was based. The economic assessment, it states specifically in the final plan that this is the guiding document for fair compensation. And McDowell Group's economic assessment recognized that the value of this fishery would be reduced to zero and the economic impact would be complete. And that was the guiding principle for allocating that amount of money into that Dungeness crab fishery. And it's very clear that the EA serves as the guiding document for this distribution of funds in this compensation plan. That's at excerpt 59. Consequently, after the Park Service receives all the compensation claims, in January of 2002, they meet in March. And it's very clear in the records, Your Honor, that the Park Service said, follow the plan to the letter, the letter of the plan. That's in Excerpt 110. That is after the claims are finalized and after the finalized plan. Moreover, Your Honors, the Park Service itself represented at Excerpt 112 this, to the statement to the public, we understand your frustration and displeasure with the final compensation plan as written, however, this office lacks the authority to change the content of the final compensation plan at this late date. Thereafter, the Park Service, after reviewing the claims, thinks this isn't fair. And so what they do is they change all the amounts in all the categories. Mr. Westcott's was reduced almost 93%. And no one in the public, particularly Mr. Westcott, including Mr. Westcott, received any notice of any of these changes until after their compensation decisions were announced and after this new methodology was posted on the Park Service's website. Now, none of these changes that the Park Service made, which we called its revised secret plan because it was done without any notice and comment, without any public participation, none of these were done by publishing. Are you suggesting that there were two plans, one of which gave your client by name one amount and then a later one that gave him a different amount? There were two plans. No, I didn't. No. No, okay. I just want to make sure that you're talking about the initial plan and then the one that divides it up. Correct. I'm sorry I didn't directly answer you. The answer is no. Because Mr. Westcott was unknown at the time. He was hypothetical. Everyone was unknown. They were all hypothetical, and that's why the plan talks about hypothetical fisherman A, hypothetical processor worker B, and they detail how their compensation is going to be included. Now, the public could not have reasonably anticipated this because it was never noticed. Now, the Park Service will say, oh, the state concurred in it, but these changes were so drastic that the person who claimed that he had said, well, we don't need to concur, didn't even have the delegated authority from the commissioner of the Alaska Department of Fish and Game at Excerpt 8 to give that concurrence or lack of concurrence on behalf of the state of Alaska. Moreover, the Park Service will argue that this is an interpretive rule, that we don't have to be publishing notice and comment. We don't have to publish in the Federal Register. But APA 5 U.S.C. 552 provides that no one will be adversely affected by an interpretive rule unless that's published in the Federal Register. This was never published in the Federal Register. This was sprung on the public. Now, you're saying adversely affected. Correct. You got, your client got $15,000, and it was out of a plan, it was a result of a plan that was trying to divide up a finite amount of money. And I'm just not, so the adversely affected, what do you mean by that? Well, Mr. Westcott and everyone else contemplated by the economic assessment as a guiding document for the final compensation plan could submit a claim that they had been adversely affected by the closures and restrictions in Glacier Bay. So it's the adversely affected by the congressional conclosures of commercial fishing in Glacier Bay that is the basis for the $23 million to compensate them for those adverse impacts. Okay. Mr. Westcott has no more livelihood. It's wiped out. His category received a specific amount in the final plan as guided by the EA. That's why his amount is so large. That was deemed fair compensation over and over, and the Park Service over and over says will be paid. The mandatory language will are the only words used in the final plan. It does not say may be changed subject to something else. We assume this is how it is. This is not a guiding policy. This is what will be paid. Is there anything that is in the record which would give us an inference as to why these amounts were reallocated? The only thing that can come to our attention, Your Honor, is statements by the Park Service saying it was more fair. Could you just tell me the language, the will be paid? Where does that appear? Certainly. If you look at the Glacier Bay compensation program, it's in the excerpt of record beginning at excerpt 54, and the statements will be paid are throughout. If you'll look at the pages of the excerpt, and I'm looking at specific crew member categories. Okay. This is the plan that was the original. Excerpt 63, the amount, the excerpt 62, once administrative costs, the money will be split in individual funds. Right. Then it says. That was done. Correct. Excerpt 63, the EA indicates how compensation should be distributed within each group. Later, the Park Service moved money outside those groups. They moved the money, but it's within each group. Then the individual. At that time, they didn't know how many people were going to be. They didn't know. Okay. They didn't know how adversely they were affected and what their claims would be. That's correct. If you look at individual crew compensation on excerpt 66, and I had it as a blow-up, but the court clerk doesn't allow large posters in the court, but it says crew members will need to document. Compensation payable to the individual crewman will be calculated as a share of compensation amount set aside for crew in each specific fishery. Total Glacier Bay earnings will be the dollar amount. Each applicant will then qualify for equivalent percentage of compensation designated for that category as calculated in the EA. This is not a guiding document that could be assumed by the public. How was that violated? Because each applicant will then qualify for an equivalent percentage of the compensation. This gets back to Judge O'Scanlan's question because he said, well, he received so much money. He was allocated that Dungeness Crab crew member category was allocated a specific component of the $23 million, and each then member who qualified as a crew member will be compensated according to that amount. Now, some plans are fair. Not all plans are fair, but some plans are more fair than others. The Park Service says, oh, the revised super plan is a much more fair plan. Okay. I think that's a very good time to stop since you're 30 seconds over. Thank you, Your Honor. And hear from the government. Good morning. May it please the Court. I'm Christine Cole from the Department of Justice on behalf of the National Park Service. Mr. Westcott does not directly challenge the $15,000 that he received under the compensation plan for his three summers of work as a teenager on his parents' two Dungeness Crab boats. This also doesn't involve the entirely separate compensation plan with some $8 million under which Dungeness Crab permit holders and others were compensated for the closure of that type of fishing in Glacier Bay. That included his parents? Absolutely, Your Honor. They were quite well compensated under that separate plan, I think over $1 million each. Mr. Westcott's arguments go strictly to the process that was used in determining the compensation for some 636 other recipients of benefits under this program. And he challenges whether or not there needed to be an additional concurrence from the State of Alaska for the final allocation of funds and whether or not notice and comment rulemaking was required for that final reallocation. Now, the key question, though, or the key issue that needs to be addressed to resolve both of those questions depends on whether or not there was a change in the fundamental compensation plan. There absolutely was no change in that plan. There was a change in terms of the allocations being made. There was $759,000 in the plan that was approved by OMB and then $39,000 with respect to this category in the final plan. Those numbers, though, were not part of the plan itself. Those numbers were the initial estimates that the economic assessment specifically said. These are just estimates. There are a lot of uncertainties in this data, and anyone who uses this data must recognize the limitations in it. So the data, those numbers were used basically as examples only. I would assume that the numbers constitute the plan. That's what the plan was meant to do, was meant to allocate $23 million, and there's a 93 percent differential between the plan as approved and the plan that finally was used. I respectfully disagree, Your Honor. The numbers themselves were not the plan. They were examples only. Again, they were based on data that the economic assessment collected, but it made perfectly clear throughout that the actual claims submitted would determine the final allocation. And if I could call your attention to Excerpt of Record, page 66. It's a page that Mr. Wyrock has quoted from several times, and I think it's very useful to look at the entirety of page 66. There's a hypothetical given there, as he indicated, and it's called a sample compensation calculation for a Tanner Pot crew member. And at the very bottom of it, there's an asterisk, and it says, this number is an example and does not represent the actual earnings of Glacier Bay crew members for the Tanner Pot fishery. And that notion that it would be based on claims submitted appears throughout both the compensation plan and the economic assessment. Another page is in the very section on page 71 of the Excerpts of Record. This is in the compensation plan where it tells the claimants how to apply for this amount of money. It specifically says that all claims must be considered before any final decision regarding compensation allocations can be made or any compensation can be paid. On page 74 of the Excerpts of Record, where it's specifically talking about fishing crew members, the category that Mr. Westcott falls in. It says compensation for crew members is based on an individual's proportion of the overall Glacier Bay crew member earnings during the qualifying eligibility period. So throughout, there were these caveats that indicated, look, what was said in those initial numbers that were picked up and put into the plan, those are just numbers for purposes of discussion. They were not the actual claims that were filed. In fact, at the time of the state concurrence and at the time of the final plan's issuance, not a single claim had been filed. So nobody knew what the realities of this were. And as it turned out, for Mr. Westcott's category, there was a big difference in those numbers, but that doesn't alter the fundamental structure and principles of the plan. And plainly something happened because the numbers weren't pulled out of thin air. These were estimates based on somebody's reasonable assessment, but something must have dramatically happened here to have a change in numbers like this. What was it? The only indication in the record comes from Superintendent Lee's testimony, and she said that they just didn't have the numbers of crew member applying that the economists in Juneau thought were going to apply. And that a lot of them, this is part-time work in many instances, she thought that a lot of them were from the lower 48 states and that they hadn't bothered to apply under the compensation program. But nobody really knows why. But the thing to keep in mind is there was a finite pot of money here. That was another of the fundamental principles that guided the plan. And to the extent that there were these differences in allocations, it was necessary to make those adjustments. Otherwise, you'd have individuals and some of the other fisheries who did earn their livelihood from this particular work would be greatly undercompensated, and individuals who worked only on a part-time basis on their parents' boats during the summer while they were a teenager would reap a huge windfall. Now, the one that had the big figures, the $759,000, the September 2001 compensation plan. Correct. That was prepared by whom? That number came from the economists, the economic assessment that was done prior to the compensation plan. Who was the private consulting group? I think it was called the McDowell Group. Is that the same? Yes. Are those the economists you were talking about? Yes, exactly. Okay. Yes, yes. And again, they did it on the basis of the data they were able to collect at the time, which was not the same thing as the claims that were actually submitted. And again, throughout that economic analysis, they themselves state there are uncertainties in this data. Any use of this information, in fact, on page 203 of the supplemental excerpts of record, the EA cautions, the economic analysis cautions that any use of the findings in this study, including in the development of the compensation plan, must recognize the limitations of the estimates. And throughout that document, it explained those estimates that they were based on some harvest data that they had, but they indicated that there were uncertainties. For some fisheries, there were no data available. For other fisheries, the data was inaccurate. There was also an issue about, you know, they got harvest data, but it wasn't clear whether that harvest came exclusively from Glacier Bay proper, which was another of the guiding principles of the compensation plan. It wasn't, this money wasn't appropriated by Congress to offset losses due to some other events in another geographical area. So the key point here is that there were no changes in the fundamentals of the plan. The various categories, the job categories, were developed by the Park Service in conjunction with the state, as well as the identification of the various fisheries. Those were all developed with the state, and none of that changed. The only thing that changed were those numbers. Let me pursue that with you. If you go to page 126 of the record, which is the chart that indicates the categories, Tanner Pot, Halibut, Dungeness, and you look at Dungeness, and it says, Vessel Crew Economic Assessment, 759,000. Are you with me yet? Correct, yes. All right. Then Vessel Crew Actual is a number below that, and then Vessel Crew Actual, whatever it is, 54 to 1. But then there's another element, 10 to 1 per category, 8 to 1 per category, which gets you down to the 39,610. Is that the number that was actually used? Yes, the 39,000. Well, maybe that explains what happened here. Does that make sense? Well, there simply weren't the number of claims. There were only 11 claims filed under this category. But here's the problem. If the plan changed after final approvals and sign-offs by the state of Alaska, there's a substantial claim to be made here that that was unfair, or at least it's compensable in some way. But if this number was already part of the original plan, well, maybe that cuts against it. Oh, let me clarify. What you're looking at on page 126, this was prepared afterwards. It goes with the previous page on page 125. And that explains, and this was posted on the website in March of 2002, I believe. So this is all afterwards? This is afterwards. This was never disclosed until? Well, there was nothing to disclose. There was nothing, exactly. There was nothing to disclose. The claims were filed, I think, from the fall of 2001 to early spring of 2002. And after all the claims, I think they were all in by January of 2002, in fact. So basically what happened, if I can hear all of this, it appears that what happened was that somebody made a gross overestimate of the number of these Dungeness Crab crew members who were going to be eligible and file claims. Absolutely. And it turned out that they weren't, and so there weren't that many. And so they adjusted within the categories because there were more in some. But they didn't have any idea of how many there were going to be at that time. And there were underestimates in other categories. But the guiding principle overall across the job categories and across fisheries is that it was based on past earnings. Mr. Wyrock also argues that because Dungeness Crab was completely closed out of Glacier Bay, that that was to receive special treatment in the compensation plan. He hasn't identified a single page where it says that. Yes, the compensation plan and the economic assessment state that some of the fisheries are affected more than others. But at no point does it create a separate way of figuring the compensation for Dungeness Crab. In fact, it says exactly the opposite. On page 65 of the excerpts of record, it says that the mechanics for all fisheries, the mechanics of the computation for all fisheries, including Dungeness, are the same. It's based on the historical harvest data. The only exception to that, and this is found on pages 64 and 70 of the excerpts of record, there had to be some adjustments for Tanner Crab, which is not what's at issue here. But for Dungeness, there were no special treatment, again, because Dungeness Crab was treated specially in the separate program, the buyout program, which is not here at issue. There were a variety of separate programs. But if we were to take the argument here that he's entitled to the amount of money in that 700 originally estimated, divided by the number of claims that were actually submitted, I guess that's his claim as far as I can figure it out, then we'd have to recalculate. There might be a lot of other people entitled to more money. There might be other people who are overpaid. We'd have to over- Well, that's the dilemma that the Park Service had. It was a finite amount of money, so you sort of have to work backwards. And it was only after the claims were submitted that they understood who was actually applying for compensation. I mean, there may well have been some people who worked in different fisheries, and they got most of their income under one, so they just applied under that. You know, it's not clear as to why there were so many discrepancies between the email assessment. Is the state of Alaska aware of all of this? I mean, this concurrence argument, what's the response? They absolutely were aware of it. The state of Alaska hired as a full-time consultant for this a gentleman who had many decades of experience in the commercial fishery business. His name was Mr. Hoffman. As Commissioner Rue, the concurring official, described Mr. Hoffman, he was his point man, his point person. Yeah, but there's evidence in the record that Commissioner Rue said that if he had known about these changes, he would have opposed them. Well, I think part of that comes from some affidavits that are not really in the record. Mr. Weirach submitted some affidavits when it looked like Commissioner Rue was going to be off hunting and wouldn't be available for live testimony. So the critical evidence, as far as what Mr. Rue testified to, is in the actual live testimony before the district court judge where he was subject to cross-examination. And Mr. Rue indicated that he relied on not just Mr. Hoffman, but also Deputy Commissioner Bosworth. Okay, stop there for a second. I'm looking at something that says Excerpt of Record 252, and it's the affidavit of Frank Rue. Is this in the record or not? Yes and no. What happened, well, Mr. Weirach never moved to include, there was no motion. He just filed a notice, here are some affidavits. And then a few days later, the district court judge altered the schedule for the hearing. He scheduled an additional day of hearing in December to accommodate Commissioner Rue. And the government moved then to exclude these affidavits. And what the district court did is he denied that as moot, the motion to exclude. And he said, I didn't rely on them because I had Commissioner Rue testifying live before me. So these affidavits, yes. So this affidavit would contradict something that Rue said in the hearing? I don't think they do contradict it. I mean, they say that he was the concurring official. Nobody disputes that he was the concurring official. What caught my attention is this passage on page 6 of 7, I guess it's 257. Had I understood that the distribution significantly changed the final compensation plan I concurred in, I would not have concurred in a new strategy unless it involved the public and affected parties having a meaningful opportunity to comment. What should we do with this? Am I allowed to look at that, for example, or not? I think you should not consider it, just as the district court did not consider it, because the more compelling evidence, you don't consider an affidavit of somebody when the person is actually testifying. You don't mean to say we shouldn't consider it, but looking at the whole record, that's not dispositive? Yes. It's in the context of his complete testimony and cross-examination, in which he makes it very clear that he relied on both Mr. Hoffman and Deputy Commissioner Bosworth. Has the state of Alaska ever objected to this? Absolutely not, Your Honor. They didn't at the time. I mean, this program has been over for seven years. The money has been distributed to the people in accordance with the final allocations. The state at no time, and, in fact, that was the testimony of Deputy Commissioner Bosworth and Mr. Hoffman, the point man for Commissioner Rue, said, you know, if we had thought there was any significant change or substantial rewrite in the plan, we would have gone back to Commissioner Rue. But we didn't have to, because this was not a change in the plan. It was something contemplated from the outset based on the actual claims. Okay. We're over time. Thank you, Your Honors. The chart Judge O'Scanlan, may it please the Court, the chart Judge O'Scanlan looked at, which changed all the ratios from eight to one, moved money between categories. And the plan is very specific that it's within categories. You can't know what's the amount of each individual claim that's going to be within a specific category until all the claims for that category come in. It's within categories, not between. Let's assume the speculation as to why the money changed between categories is correct. Let's assume that most of the Dungeness Crab crewmen who were down from the lower 48 worked part-time, didn't apply. On the face of it, if that's the case, then I don't understand why the 759,000 should be considered immaculate and untouchable. Why is it that everybody in that category, the half-dozen people that did apply, should win the lottery? The duty of the government is to provide notice and comment to those affected. I'm trying to find the logic of the plan, because this speaks to whether the State of Alaska's approval makes any sense. To me, frankly, it does make sense. So, separate and apart from your APA arguments, I'm trying to figure out what's illogical about what was done. Because what was in the plan was based on an economic assessment that took the best available information. Fine, but that doesn't answer my question. Because why is it your client should collect big-time, because he's one of the half-dozen people who applied, and 700 people that went back to the lower 48 didn't apply. Your client's not the representative of that group. Why should he collect big? He's not, but he is one of the few that is affected by the entire closure of that fishery. No one else was affected like Mr. Westcott. Everybody in his category is affected exactly the same way. Why should he collect because the people that went back to the lower 48 didn't? Because of the amount of money that he submitted, and the claim that he submitted justifies applying the formula in the final plan. He submitted a claim of $15,000 of earnings during the time period attributable to fishing in the now-closed waters. And you want him to collect $750,000? According to the plan. $750,000? Yes, Your Honor. That's what the plan states. Is there any logic in that? Yes, because that's what the public knew about. No, no, no. Is there any logic in the division as to why he should collect so much more of his actual, much like a 20-to-1 ratio of his actual earnings, as opposed to what the other people are collecting? Because as a teenager, he has no more livelihood in that park service water for Dungeness crab fishing anymore. He's not incapable of doing anything else? That's not large. That is the weakest possible case. Because he's got his whole life ahead of him to do something else. The guy I'm worried about is the guy who's 53, has done this his whole life. That's not your client. That's not, and that's not the issue before the court, and he probably got compensated under other parts of that compensation plan if he operated in other fisheries. Did anybody else get compensated on a 20-to-1 ratio as compared to actual earnings? No. Okay. We're over time. Thank you. The case just argued is submitted for decision.
judges: Schroeder, O'scannlain, Clifton